# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 9, 2009 Session

## STATE OF TENNESSEE v. LINDA M. MORAN

### Direct Appeal from the Circuit Court for Lincoln County
### No. S0800053    Robert G. Crigler, Judge

---

### No. M2009-00171-CCA-R3-CD - Filed June 29, 2010

---

Appellant Linda M. Moran pled guilty to a 207-count indictment after it was revealed that she had stolen approximately $73,000 from her employer over the course of nearly a decade. At sentencing, Appellant argued that she should be given some form of alternative sentencing. The trial court disagreed and imposed an effective sentence of nine years in custody. Appellant contends the trial court erred in denying alternative sentencing. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Stephen W. Pate, Murfreesboro, Tennessee, for the appellant, Linda M. Moran.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Hollynn L. Hewgley and Ann L. Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

Dixie Smith Insurance Agency hired Appellant in 1991, at the behest of Appellant's father, because Appellant needed a job as a condition of her sentence for a federal misappropriation of funds conviction she received earlier that year. In the late 1990s she started stealing the agency's cash. In all, she stole approximately $73,000 over the course

of nearly a decade. When investigators questioned Appellant, she confessed. She later pled guilty to a 207-count indictment and requested that the trial court grant alternative sentencing.

The State's first witness at the sentencing hearing was Joe Smith. Mr. Smith testified that he had been married to Dixie Smith, the owner of the agency, for 41 years. Mr. Smith testified that he was self-employed in real estate and that he was also involved in the insurance business. Mr. Smith's real estate business was located on the same premises as Ms. Smith's insurance agency.

Mr. Smith testified that due to health problems, Ms. Smith chose not to testify at the sentencing hearing. He explained that Ms. Smith's health deteriorated after Appellant's actions came to light. He noted that Ms. Smith, who was 60 at the time of the hearing, suffered from a skin rash and high blood pressure. She also had difficulty sleeping at night. Mr. Smith conceded that her condition was not debilitating.

Mr. Smith testified that he was familiar with Appellant's employment at the agency. Although he did not know Appellant before she began working at the agency, he knew of Appellant's family, which, he noted, was prominent in town. Mr. Smith recalled that in 1991, Appellant's father approached Ms. Smith about hiring his daughter. She ultimately hired Appellant, even though she was aware of Appellant's federal conviction.

Prior to the discovery of the thefts from the agency, Appellant appeared to be a good employee, and she took on additional responsibilities within the agency. Mr. and Ms. Smith helped Appellant obtain her state insurance license. They wrote letters and made telephone calls to the insurance commissioner, and they made trips to Nashville on Appellant's behalf. Eventually, Ms. Smith put Appellant in charge of handling deposits for the agency.

Mr. Smith testified that he tried to help Appellant when she encountered financial problems in the years prior to the revelation of her thefts. When Appellant's car was repossessed in 2007, Mr. Smith loaned her one. He also put in a "good word" for her at a bank to support her application for a loan. Additionally, he loaned Appellant $3,200, which was never repaid.

Mr. Smith learned that he was not the only person to whom Appellant turned for help. Appellant obtained a loan from an elderly co-worker, which likewise was not repaid. Appellant also approached a handful of the agency's clients about loaning her money.

In December 2007, the agency asked its accountant and a retired bank officer to perform an accounting. The accounting revealed that from January 1997 to December 2007, approximately $73,000 had been taken from the company.

Mr. Smith testified that Appellant's thefts had a significant impact on him, Ms. Smith, and the agency. He explained that the money taken from the agency could have gone toward the couple's retirement or to their grandchildren. Mr. Smith said that because of the thefts, the couple will have to delay retirement. Moreover, the agency's reputation suffered, as did its finances. Mr. Smith recalled that there was local gossip about the thefts and that the agency sent, at its own expense, reassuring letters to its approximately 1,500 clients. Mr. Smith acknowledged that the agency had not lost a significant number of clients and none of the agency's clients lost coverage due to Appellant's actions. However, Ms. Smith had to assume additional responsibilities to maintain the agency's normal operations after the loss of Appellant as an employee and to resolve matters with investigators and regulators. These additional demands caused Ms. Smith to work longer hours and prevented her from taking vacations. Mr. Smith noted that the added stress had caused Ms. Smith to start talking about leaving the business, something she had not previously discussed.

Mr. Smith testified that he wanted Appellant to get help for her problems so that she would not steal again. He also wanted Appellant to repay the money she took from the agency. He doubted, however, that Appellant would ever do so.

Appellant also took the stand at the sentencing hearing. She testified that she was divorced and had two adult children. Appellant graduated from high school and had attended some classes at the University of Georgia. Her ex-husband, the children's father, died in a car accident in 1985, shortly after the divorce. Around that time, her daughter began experiencing debilitating seizures that ultimately caused brain damage. Although her daughter is disabled, she graduated from a special education high school and was employed by Domino's Pizza. She remained under a doctor's supervision and required medication.

Appellant testified that her son was independent and employed. However, in 2006, Appellant "signed" for some loans her son obtained for a business.

Prior to her employment at the insurance agency, Appellant worked at a credit union. She began working for the credit union in 1985. Appellant embezzled $26,000 from the company during a three or four year period. In 1991, she pled guilty to a federal charge of misappropriating funds. She was sentenced to sixty days in a halfway house and three years of supervised probation. She never spent any time in federal prison, and she successfully completed the sentence. She had no other convictions.

Appellant said that she began working at the insurance agency in 1991 as a customer service representative. Because she had been able to obtain a job, she was allowed to go home during the weekends while she was assigned to the halfway house.

Appellant testified that she had the "greatest respect and admiration" for Ms. Smith. She acknowledged that the Smiths had done much for her. Appellant noted that with the help of the Smiths and her church, she was able to obtain her insurance license. She also acknowledged that she borrowed a car from Mr. Smith when her car was repossessed.

Appellant testified that she used the money she stole from the agency for everyday expenses. She said that she did not purchase any big-ticket items and that she did not live an extravagant lifestyle. She denied spending the money on drugs or alcohol. Appellant maintained that she used the money to pay off credit cards and other bills, which she ran up by purchasing items such as toys and clothing for her children and grandchildren. She admitted that the items she purchased for her children were not "necessities" and that she began stealing from the agency when her children were 18 and 21 years old.

Appellant admitted that she borrowed money from her 80-year-old co-worker. She also admitted that she never repaid the loan and that her co-worker had to file a lawsuit against her. Appellant also asked a handful of agency clients for loans. Appellant filed for bankruptcy in July 2008, and her debts were ultimately discharged.

Appellant testified that she knew her actions would have a terrible impact on Ms. Smith. In particular, she knew that Ms. Smith had high blood pressure and that the thefts would cause her additional stress. However, Appellant said that the thefts did not cause any client to lose their coverage and that she was not aware of any client being adversely affected by her actions.

Appellant had not paid any restitution prior to sentencing. She testified that she was "perfectly capable of working" but was not employed. She had not sought a job because of the uncertainty about her sentence. Furthermore, Appellant testified that her family was either unwilling or unable to assist her with restitution. On cross-examination, Appellant admitted that she had not asked her family to pay the restitution, even though her attorney had specifically asked for a continuance in order to pursue other avenues to pay the restitution. Appellant also admitted that her father was paying for her attorney.

Appellant testified that she had recently discovered that she was eligible for a monthly social security survivor's benefit. She explained that she was entitled to the benefit because she had a disabled child whose father had died. Appellant began receiving monthly payments of $1,107 a few days prior to the hearing. Appellant noted that the payments are subject to

an income cap. She testified that if her annual income rose above $13,600, her benefit would be reduced. Therefore, she would have to "watch what [she] made" and would "keep [her] work down" in order to receive the full benefit.

Appellant explained that she intended to contribute the entire amount of her monthly survivor's benefit to the restitution. Consequently, Appellant and her daughter would pay rent, bills, and other expenses from her daughter's income plus any income Appellant might be able to obtain. Her daughter earned approximately $500 per month and received a social security benefit of $971. There were no other sources of income.

Appellant admitted that in January 2008, after her thefts were uncovered, she wrote a bad check for $250. Appellant testified that she "took care of it" but acknowledged that she only did so seven months later, after an arrest warrant was issued. Moreover, she "took care of it" with money she received from a social security benefit.

At the conclusion of Appellant's testimony, the State called Tennessee Department of Commerce and Insurance Fraud Investigator Joe Nacher to testify. Mr. Nacher was assigned to investigate Appellant's case in January 2008. In April 2008, Mr. Nacher and Eric Emert, an agent with the Tennessee Bureau of Investigation, questioned Appellant about the case. After being advised of her Miranda rights, Appellant gave a lengthy confession. Mr. Nacher testified that Appellant said she had stolen the money, in part, to help her son's business. At that meeting, Appellant also volunteered to surrender her insurance license. Mr. Nacher explained to Appellant that the State would send her paperwork to effectuate the surrender. However, the State sent the paperwork two times, and Appellant did not respond.[1]

At the close of evidence, the trial court denied Appellant's request for alternative sentencing. The court began by examining the applicable mitigating and enhancing factors set forth in Tennessee Code Annotated sections 40-35-113 and 114. It noted that mitigating factor 113(1) applied because Appellant's crime did not cause or threaten serious bodily harm. However, the court gave little weight to that factor, noting that thefts typically did not pose such risks. It specifically found that mitigating factors (3) ("[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense") and (7) ("[t]he defendant was motivated by a desire to provide necessities for the defendant's family or the defendant's self") did not apply, finding that Appellant was motivated to steal from the agency largely to bail out her son's failing business and that the money was not used to provide necessities for her family. The court noted that Appellant's admission and cooperation supported mitigation under factor (13) ("[a]ny other factor consistent with the purposes of this chapter") and that those decisions saved the State the

---

[1] The record reflects that Appellant signed the paperwork in court during the sentencing hearing.

-5-

expense of a trial. Yet the trial court gave those facts less weight because it found Appellant's confession and cooperation were the result of her conclusion that she had been caught.

The court found that two enhancement factors weighed heavily against Appellant. Although it rejected several of the State's proffered enhancements, it concluded that enhancement factors (1) and (14) applied and deserved "enormous weight." Indeed, it concluded that the two enhancement factors "are of such great weight that it is probably not necessary to consider the other [enhancement factors]." Specifically, the trial court found that Appellant had a previous history of criminal conduct under factor (1). It noted that Appellant's 1991 federal conviction was for a similar crime that, like the present offense, extended over a period of years. In addition, the court found that Appellant abused positions of both private and public trust in committing the instant offense and thus applied factor (14). The court reasoned that the evidence established that the Smiths hired Appellant at a time when she needed their assistance, they continued to support her in times of need, and they placed significant faith in her. Appellant's conduct was thus a severe betrayal of their private trust. Moreover, the court found that Appellant's crime was in part facilitated by her state insurance license. The misuse of that license, the court found, was an abuse of public trust within the meaning of enhancement factor (14).

The court then turned to its analysis of the appropriateness of alternative sentencing. It noted that because Appellant was convicted of two Class B felonies (counts one and two), she was not entitled to the statutory presumption that she is a favorable candidate for alternative sentencing under Tennessee Code Annotated section 40-35-102(6). With respect to the sentencing considerations in section 103(1), it noted that although Appellant did not have a history of multiple convictions, she had a long history of criminal conduct. It further noted that Appellant was not far removed from her federal probation when she began the present crimes. The court noted that Appellant's history of criminal conduct alone was sufficient to deny alternative sentencing. The court further found that confinement was necessary to avoid depreciating the seriousness of the offense. Noting that this consideration applies when offenses are "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree," the court found that Appellant's offense qualified because of the dramatic abuse of trust and the lengthy, sustained criminal intent. The court also concluded that less restrictive measures had been applied in the form of Appellant's federal probationary sentence. The court found those less restrictive measures to be unsuccessful, as evidenced by Appellant's commission of nearly identical offenses in the instant case.

The trial court also found that, although restitution was statutorily required, Appellant's claim that she would pay the restitution was not credible. Explaining that

Appellant's proffered payment plan was "just pie in the sky," the court concluded that Appellant was unlikely to ever pay the restitution. In particular, the court stated:

> To tell you the truth, had I given a split sentence, we would be right back here in a couple of years. . . . [Appellant] wouldn't pay it, and her probation would be revoked. We would just wrestle with it forever and never collect any substantial amount of restitution.

The court noted that Appellant's failure to offer restitution and her failure to pursue employment prior to the sentencing hearing was an indication of Appellant's bad faith in her asserted aspirations to pay restitution. Further, the trial court rejected the notion that Appellant should be permitted to simply live off of her disabled daughter's income.

The trial court thus denied Appellant's request for alternative sentencing and ordered her confined for an effective term of nine years. As required, it also ordered Appellant to pay restitution.

Appellant now appeals the denial of alternative sentencing.

## II. Analysis

Appellate review of the manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2006). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on Appellant to demonstrate the impropriety of her sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The Sentencing Reform Act of 1989 encourages judges to utilize non-incarceration sentencing alternatives. See Tenn. Code Ann. § 40-35-103(6); see also State v. Ring, 56 S.W.3d 577, 584 (Tenn. Crim. App. 2001). The Act also provides that certain offenders

should be considered "favorable candidate[s] for alternative sentencing." Tenn. Code Ann. § 40-35-102(6). Because Appellant is a Class B offender, she is not among those "favorable candidate[s]." Id. At the same time, however, sentences involving incarceration should be based upon the following:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). The trial court may consider the applicable mitigating and enhancing factors under sections 113 and 114 as well as "the potential or lack of potential for rehabilitation" in determining whether incarceration is appropriate. State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996); see also Tenn. Code Ann. § 40-35-103(5).

The record reveals that the trial court's sentencing analysis was thorough, cogent, and well-reasoned. Upon review, we conclude that it was also correct.

We agree that the sentencing considerations and Appellant's potential for rehabilitation all strongly counsel in favor of incarceration. Appellant has now twice engaged in extended, multi-year schemes to steal money from her employers. After being caught the first time, she made grand pronouncements about the lessons she had learned. However, when Ms. Smith gave Appellant an opportunity to move beyond her federal conviction, Appellant lulled Ms. Smith into giving her greater and greater responsibility. She then spent a decade stealing from Ms. Smith's agency. This history strongly suggests Appellant needs to be confined in order to protect society. See Tenn. Code Ann. § 40-35-103(1)(A). This history also indicates that the less restrictive measures applied by the federal court in 1991 were unsuccessful and that Appellant has little potential for rehabilitation.

The applicable enhancement factors also strongly counsel in favor of confinement. Enhancement factor (1), Tenn. Code Ann. § 40-35-114(1), applies for the same reasons discussed with respect to section 103(1)(A). Enhancement factor (14) also applies. While we agree that the connection between Appellant's conduct and her possession of a state insurance license suggests an abuse of public trust, cf. State v. Brooks, 228 S.W.3d 640, 645-46 (Tenn. Crim. App. 2006) (noting that "private individuals [can] be responsible for abusing positions of trust when working with the public at large"), we need not decide the applicability of the factor based on that aspect of the case. Instead, the factor clearly applies

because of Appellant's undeniable abuse of the Smiths' private trust. Despite all that the Smiths had done for Appellant, and despite her admitted awareness of the devastation her conduct would cause, Appellant continued to betray them for years. We agree with the trial court that these enhancement factors are entitled to substantial weight.

We conclude that the trial court properly considered the sentencing principles and relevant facts and circumstances in denying alternative sentencing. Appellant's offense did not cause or threaten serious bodily injury. Yet, as the trial court pointed out, that is true of most theft cases, so that factor is not entitled to significant weight. Appellant's thefts were admittedly not for the purposes of providing necessities for herself or her family, so mitigating factor (7) does not apply. Appellant makes essentially the same argument with respect to factor (3), and it likewise fails. Appellant's admissions and cooperation weigh in her favor under factor (13), but the trial court concluded that these mitigating factors cannot overcome the overwhelming force with which other considerations favor confinement. We agree.

Finally, our conclusion is unshaken by Appellant's argument that alternative sentencing will allow her to pay restitution. Appellant is adamant that she will contribute her entire monthly social security benefit to pay restitution. However, the moral gymnastics necessary to justify diverting funds which are ostensibly made to care for a disabled child whose parent has died, <u>see</u> 20 C.F.R. § 404.301 *et seq.*, to pay restitution for a theft, while purportedly avoiding employment in order to retain the full benefit, are beyond this court. That is especially true in light of the fact that it requires the disabled daughter to then shoulder the lion's share of the burden of providing for her mother.[2] Yet we need not rely on the unsavoriness of Appellant's restitution plan as our basis for rejecting her argument. Instead, we simply point out that the trial court found, and the record supports, that Appellant's claim that she would pay restitution lacked credibility. We agree with the trial court that it is "pie in the sky."

### III. Conclusion

For the foregoing reasons, upon review, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

---

[2] That is not to say Appellant would not help care for her daughter or that her daughter would not benefit from being near her mother. Nothing in the record suggests otherwise.